## No. 5498.

### T. J. ESTES *v.* THE STATE.

1. RECEIVING STOLEN PROPERTY—HEARSAY TESTIMONY.—See the opinion *in extenso* for evidence adduced on a trial for receiving stolen property, knowing it to have been stolen, which, being hearsay testimony, should have been excluded.

2. SAME—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for receiving stolen property, knowing it to be stolen.

APPEAL from the District Court of Falls. Tried below before the Hon. Eugene Williams.

The conviction in this case was for receiving from George Gool two horses, knowing that the same had been stolen, and the penalty assessed was a term of nine years in the penitentiary.

J. T. Scott was the first witness for the State. He testified, in substance, that he lived in Angelina county. Witness never saw defendant until he saw him in custody in Falls county. On the night of February 21, 1886, two horses, a bay and a sorrel gelding, were stolen from the witness's lot near his house in Angelina county. When the witness discovered the theft, on the next morning, he secured the sheriff and a deputy sheriff of Angelina county and started in pursuit of the thief or thieves. They traced the horses to Jewett, in Leon county, but could trace them no farther. Witness recovered the horses from Mr. Whitaker, the sheriff of Falls county, some time in March, 1886. Witness never gave his consent to the defendant or anybody else to take his horses. Witness had never known a man named Gool, nor one named Dupree. He did not know who took his horses, nor did he know anything of the defendant's connection with the horses.

L. Sharp was the next witness for the State. He testified that he lived in San Augustine county, and knew Mr. Scott, the State's witness, and Mr. Graves. He was a member of the sheriff's posse which traced some stolen horses to Falls county, in February, 1886. Those horses belonged to Messrs. Scott and

Graves. Scott lived between forty-five and fifty miles from San Augustine. When witness reached Scott's house, he took the trail and followed it to Crockett. At Crockett, witness took the train to Marlin, in Falls county, reaching that town late in February. Witness applied to Sheriff Whitaker, in Marlin, and upon information received from him, procured horses and went to Mooresville, in the western part of Falls county. Witness searched for the horses on the west side of the river for two or three days, and went back to Marlin. He had been in town about fifteen minutes when Mr. Lee Estes came into town, riding the iron gray horse belonging to Mr. Graves. Witness's special search was for two horses taken from his county—one a black and the other horse the iron gray which belonged to Mr. Graves. The witness and Charley Norwood then went with Lee Estes to the Estes ranch, where they found the two horses belonging to Scott, the bay gelding being then in the possession of the defendant. Defendant then told witness where he would find the sorrel gelding. He said that he got the Scott horses from some men who said they were from Hico, in Hamilton county. He said that those men told him that they owned a ranch in Hamilton county; that the horses described were surplus stock which they wanted to sell, and that he gave them a mare and boot (witness had forgotton how much) for them. He gave a description of the men who traded him the horses, which corresponded with the description of the men the witness had been following. He said further that he did not observe the direction taken by the men when they left, after the trade, but, as he had heard of their crossing the river over the Calvert bridge, he thought they had gone to Calvert. He said that he delivered the parties a bill of sale with the mare he traded, and exhibited a bill of sale purporting to be the act of one George Gool, conveying to him the bay gelding and the sorrel pony. Defendant first told the witness that he paid one hundred and fifty dollars for the two horses. Witness then remarked that, as the men sold all their horses at the same place, he would like to know how they went off,—if on foot. Defendant then said that he gave them a mare in part pay, and that Anderson, who bought some horses of them, gave them a mare in part payment. Witness then asked defendant if he had a bill of sale conveying the horses. He replied that he had, but that it was at a neighbor's house. He then sent some one to a neighbor's, who pres-

ently returned bringing two bills of sale, one conveying the two Scott horses to defendant.

From defendant's ranch, in Falls county, witness traced the men he had followed to that county back into San Augustine county, and thence into Louisiana. Some time afterwards the men returned to San Augustine county, and while resisting arrest were killed within half a mile of San Augustine. The men killed corresponded with the description of the men given to witness by the defendant. On the body of one of those men the witness found a bill of sale, signed in the name of the defendant, which purported to convey a mare to one George Gool. One of the men had a repeating rifle, and it was the recollection of the witness that defendant told him he traded a Winchester rifle to the men. One of the men killed, the witness knew by the name of Gool. He had never known the other as Dupree. The men were shot on Sunday night. One of them was killed outright, and the other lived without speaking until Monday at noon, when both were buried. On the following Sunday Deputy Sheriff Barlow, of Falls county, reached San Augustine, and the bodies were disinterred for inspection by Mr. Barlow. Barlow recognized the man called Gool, but did not recognize the other man.

Cross examined, witness said that when Lee Estes, Norwood and himself reached the Estes ranch he found Scott's bay horse hitched to a large tree in plain view of the house. Defendant said that the strangers who traded him the horses pretended to be hunting stock, but that he supposed they gave up their search very soon, as he heard of their crossing the Brazos bridge. One Stallworth, whom witness met in Marlin, told witness that he had found one of the horses witness was looking for. Stallworth took witness to Lee Estes, who was in Marlin, and Lee Estes conducted witness to the place where the gray horse was hitched. From information received from Lee Estes, witness went to defendant's ranch and recovered the other horses. The statements made to witness by defendant at his ranch were open and candid, and, as far as they were tested and investigated by witness, were found to be true. There was no scar on the face of the man who was called Gool. Decomposition had not yet supervened when the body was disinterred. His coffin was found full of water, and the body looked natural. The body of the other man was badly decomposed, and was swollen beyond recognition.

Lee McDonald testified, for the State, that in the afternoon of one day late in February, 1886, he and the defendant met two men in the road about twenty yards apart. Each man was riding a horse. One of them was leading another horse, and still another horse was following. One of the horses was a black, one a bay, one a sorrel and one a gray. They were all in good flesh, but appeared to be jaded. When the men first came in sight they were between two hundred and three hundred yards apart. Witness had never seen either of them before. The man who rode in advance was between twenty-seven and thirty years old, had a light complexion and a dyed moustache. The other man had a dark complexion, and dark hair cut short. They stopped when they met witness and defendant, and asked to be directed to the Estes ranch. They did not give nor ask names. Defendant told the men the way to the Estes ranch, and that he was one of the Estes boys. As they started on the dark man turned and asked defendant if the other Estes was at home. Witness did not remember what defendant said in reply. It appeared to the witness that when the defendant and the light complexioned man met they recognized each other. He could not then see defendant's face, but, judging from the expression on the light complexioned man's face, witness thought their recognition was mutual. This testimony was admitted over the defendant's objection. When the two men first came in sight defendant said something about them which impressed the witness with the idea that he knew them. The men did not have the appearance of being stockmen. Defendant told the men to go on to the ranch; that he was then in a hurry, but would be at home soon. Defendant was then going with witness to get a yearling witness had bought from him. He remained with the witness all the afternoon. The witness afterwards saw the horses described in the possession of the defendant. He observed nothing peculiar about the mane or tail of either of the horses. He did not know the men, or either of them, as Gool or Dupree.

C. A. Norwood, deputy sheriff of Falls county, testified, for the State, that he went with the witness Sharp from Marlin to the Estes ranch, about twenty-one miles from Marlin. They found the defendant, another man and a negro at the ranch. The defendant had the Scott bay horse. The Scott sorrel horse was recovered from Ward, who lived near the Estes ranch. The

black stallion was recovered from Anderson, who lived in the neighborhood, and the gray horse was recovered from Lee Estes.

Lee and Tom Estes (defendant) were called upon for bills of sale to the horses in their possession, and they sent to a house near by and got them. The bills of sale conveyed the two horses, the bay and the gray, to the Estes boys for the consideration of one hundred and fifty dollars, and were witnessed by Ward and Anderson, Anderson being the man who had the black stallion. Sharp took the black and gray horses home with him, and left the bay and sorrel Scott horses with Sheriff Whittaker in Marlin. Defendant said that the men from whom he bought the Scott horses were strangers to him. He said that the men claimed to be from Hico, Hamilton county, and ostensibly were hunting stock. Defendant and Lee Estes said that the men came to their ranch on Thursday evening, gave their names as Gool and Perkins, and left on Saturday morning. Defendant said that he did not know which way they went, but that he afterward heard they crossed the Brazos river near Calvert. Lee Estes said that he traded a new black hat with one of the men for an old white hat. Lee Estes told the witness and Sharp before reaching the ranch, that the defendant paid one hundred and fifty dollars for the two horses. After reaching the ranch defendant said that he gave a mare in part payment. He first said that he gave one hundred and fifty dollars in money for them. Witness thought the bay horse was worth about one hundred dollars and the gray about sixty dollars. The witness heard something said about the men getting a gun and saddle in part payment, but witness did not remember what.

John T. Barlow testified, for the State, that he knew the two horses described in the indictment, and considered the two worth at a fair valuation one hundred and fifty dollars or one hundred and sixty dollars. He last saw these horses in the possession of the State's witness Sharp. Witness knew the smaller of the two strange men from whom defendant claimed to have purchased the horses. Witness met him in the fall of 1885, at the house of Mark Harwell, in Falls county, Texas. He was introduced to witness as Mr. Dupree. Witness saw that man several times. The other man went by the name of Gool in San Augustine county. The witness met Dupree several times before the alleged theft of the Scott horses, and understood, but did not know as a fact, that he lived then or had lived at or near the Estes ranch. Witness saw the bodies of the two men on the Sunday

night after they were killed. He went to San Augustine county and had the bodies exhumed for the purpose of identifying them, if he could. He recognized the smaller as the body of the same Dupree to whom he had been introduced at Mark Harwell's during the preceding fall. Witness identified a book and some wristlets as articles turned over to him by a justice of the peace of San Augustine county, or by Sharp, he did not remember which. Decomposition had not yet supervened on the body of Dupree, and witness had no difficulty in identifying him. He did not know the other body. Dupree, as well as witness could recollect, was called Jack Dupree. Witness saw an order on Titus Drinkwood for a gun, in favor of one Gool, signed by the defendant. That order was said to have been found on the body of the man who was shot and killed at the time Dupree was killed. The wristlets described by witness, and which were said to have been found on one of the bodies, bore the initials " T. E."

Cross examined, the witness said that after his introduction to Dupree he knew him well enough to recognize him at once on sight. Witness last saw Dupree alive at Mark Harwell's in Falls county, in the fall of 1885, but did not then observe anything peculiar about his eyes. He had a "swinging" walk, but if he had a scar on his face, witness did not observe it. The witness did not know it to be true, but had heard that Dupree got into trouble about a horse at Durango, Falls county, Texas.

Re-examined, the witness said that he observed Dupree closely, because he corresponded closely with the description of a man for whom witness was looking. The sheriff of San Augustine county showed the witness a repeating rifle which looked very much like a Winchester gun.

L. Sharp, being recalled, testified that the two men spoken of on this trial as Gool and Dupree had a repeating rifle with them when killed, which rifle afterwards was kept by the sheriff of San Augustine county, in his office.

Justice of the Peace Miles testified, for the State, that he had before seen the wristlets in evidence. They were then in the possession of Mr. Rice. Defendant, who was present, claimed them as his property, and said that they were stolen by the two strangers who sold him the horses, and that he lost a silk handkerchief at the same time.

The State next read in evidence the voluntary statement made by the defendant on his examining trial. The substance of this statement was, that, about the middle of the afternoon, on or

about Thursday, February 25, 1886, while he and Lee McDonald were en route to transact some business, they met two strangers on the road. Those parties appeared to be stockmen. They asked for directions to the Estes ranch. Defendant gave them the direction, and told them that he was one of the Esteses; that he was then in a hurry, but that, if they would go on to the ranch, he would soon be back and serve them the best he could. One of the men asked if there was anybody at the ranch. Defendant told him that they would find two young men and a negro there. They then left, going towards the ranch. Defendant got back to his ranch about dark, and found there the two strangers, his two brothers, James Thompson and Thomas Crawford. That night those two men showed defendant some brands, said that their names were George Gool and — Perkins; that they lived in Hamilton county, and were hunting stock. On the next morning Perkins complained of being unwell and asked to be permitted to remain at the ranch until Saturday morning; which was granted. On Saturday morning the men proposed to trade the bay horse and the sorrel pony to defendant. Defendant finally traded for the animals, giving in exchange thirty dollars in money, a mare worth seventy dollars, a saddle worth thirty dollars, and a Kennedy rifle and holster worth twenty dollars, about or near the value of the two horses. Witness also sold them another rifle, which they were to get in Calvert. For that rifle they gave the defendant ten dollars in money and an old saddle. Defendant had since learned that they never called for the rifle. On Saturday morning, about noon, defendant left the men at his ranch negotiating a trade with William Anderson, and never saw them afterwards. Defendant had no previous knowledge of or acquaintance with those men. They conducted themselves as stockmen ordinarily do, and witness had no suspicion of their title to the horses. The State closed.

J. E. Thompson was the first witness for the defense. He testified that he was at the Estes ranch in February, 1886, when two men came there with four horses, a bay, sorrel, black and gray. Defendant got to his ranch after dark. He and the two men, to all outward appearances, were strangers. Witness and Crawford and a negro were the only persons at the ranch when the men got there. Sometime afterwards, when Lee and Eugene Estes rode up to the fence, the men asked witness and Crawford who those men were. One of those men proposed a horse trade with witness, and but for the high price he placed on his horses,

witness would have traded. Witness knew John L. Dupree well, and knew that neither of the men described was John L. Dupree. John L. Dupree was about six feet high, had black hair, dark complexion and a scar under his eye, and a peculiarly shaped mouth. He was between twenty-three and twenty-five years old, and wore no beard. Defendant was a stock man and an extensive dealer in cattle. Witness's business at defendant's ranch was to buy beef cattle. Witness last saw John Dupree in the fall of 1884, when he was living on Flynn's place in Milam county, Texas. Defendant knew John L. Dupree well. The men were not asked their names when they came to the Estes ranch on that evening, nor did they tell their names in the hearing of the witness. Lee Estes and witness slept at Ward's house on that night. They returned next morning to the Estes ranch, and found one of the men complaining of being sick. Crawford and witness left the Estes ranch about nine o'clock on that morning, without buying beef cattle. They left the two strangers at the ranch.

John Anderson was the next witness for the defense. He testified that he knew John L. Dupree well in 1885. Dupree was then about twenty-three years old, was about six feet high, had a dark complexion and hair, and a scar under and a squint in the right eye—the sign manual of a pugnacious mule. He had narrow hips, a full breast, and a very peculiar walk. He lived for a while with Mr. Flynn, in Milam county. Witness saw Dupree one night in August or September, 1886— some months after he was said to have been killed in San Augustine. Of this fact witness was positive, as he was in company with him, Dupree, on that occasion, about three hours. The defendant was well acquainted with Dupree. John L. Dupree was the same man who was said to have got into trouble in Durango about a horse. When witness met him in the said August or September, he was in company with the defendant. Their meeting was in Calvert. Witness went with him that night to the business places of Burke, Martin, Drennan and Garrett. His purpose in going with Dupree to those places was to show that Dupree had "risen from the dead." Dupree said that night that he was not in Texas at the time that he was reported to have been shot and killed in San Augustine county.

George Burke, mayor of the town of Calvert, testified that he knew a man named John L. Dupree. He saw Dupree in the town of Calvert one night in August or September, 1886. He

was then in the company with the defendant, Mr. Anderson and others. Witness was called up on that night for the purpose of identifying Dupree, which he readily did.

John Martin, testifying for the defense, stated that he knew John L. Dupree well, and saw him on the same night that he was seen by the witness Burke. Dupree told witness that he had been accused of being dead, and had come to exhibit himself as a particularly animated corpse. He did not move around much like a dead man. A cloud of other witnesses for the defense testified that they saw Dupree as late as August and September, 1886—long after his reported death.

John Ward testified, for the defense, that he was present and witnessed the defendant's trade with two strangers for the horses described in the indictment; the same being the horses described in the bill of sale now exhibited to the witness. The witness wrote that bill of sale, and signed his name to the same as a witness. The man who signed the bill of sale as vendor was a sallow-faced, light complexioned man, who called himself George Gool, and so signed the bill of sale. The consideration named in the bill of sale was one hundred and fifty dollars. Witness knew that the consideration was liquidated in part with a mare and thirty dollars in money, which defendant paid Gool in witness's presence. He afterwards saw Gool in possession of a saddle which the defendant had previously owned. The bay horse bought by defendant from Gool, because of age and other deficiencies, was not worth over seventy five dollars. Witness afterwards bought the sorrel pony from defendant, paying him every cent he was worth, which was fifty dollars. The witness knew John L. Dupree well, and knew as a fact that John L. Dupree was not one of the strangers who traded the Scott horses to defendant. The man with Gool said that his name was Perkins. Anderson purchased a horse from the strangers, that transaction taking place at witness's house. Witness either wrote or dictated the bill of sale given on that occasion. Gool spelled his name "G-o-o-l." Witness did not hear the terms of the trade between Anderson and Gool, but knew that Anderson got the black stallion, and Gool got Anderson's brown mare. Lee Thompson was at the Estes ranch on the evening before the horse trade.

C. W. Harper, testified, for the defense, that he lived about a quarter of a mile from the Estes ranch. He saw two strangers at the Estes ranch one evening late in February, 1886. On the

next day, at witness's house, Lee Estes traded horses with one of these strangers.

Thomas Crawford testified, for the defense, substantially as did the witness Thompson.

John Clanton testified, for the defense, that some time in 1886 he saw a description of stolen horses in the Galveston News, and told Lee Estes that the description of one of them suited the gray stallion he had traded for recently, and was then riding openly through the country; and advised him to see the sheriff, return the horse if he was the stolen horse, and secure the reward. Lee Estes rode off, saying that he traded for the horse with two strangers, but would see the sheriff. Witness had not then seen Mr. Sharp, and did not know that Sharp had yet been in that part of the country.

William Stallworth testified, for the defense, that Lee Estes came to him and asked if he knew of any person in the country hunting horses. Witness replied that he did, gave a description of the horses and remarked that the gray stallion he was then riding corresponded with the description of one of them, and asked him if he, Lee Estes, knew where the others were. He replied that two of them were on his ranch, and asked witness to go with him to Marlin and help him secure the reward, if any was offered, for the horses. Witness went with him to Marlin, and they hunted up Sheriff Whitaker. Whitaker told them that Mr. Sharp, of San Augustine, had just come to town in quest of stolen horses. Witness, Whitaker and Lee Estes then hunted up Sharp, and Lee Estes led the way to the gray horse.

Titus Drinkwood testified that in February, 1886, he had a gun belonging to the defendant. Early in March defendant asked if anybody had demanded that gun upon an order from him. Witness replied in the negative. Defendant then said that he had conveyed the gun in a horse trade, but that the witness, instead of surrendering the gun if called for, should get Drennan to arrest the party or parties calling for it. The gun and holster were worth about twenty-five dollars.

The defense closed.

The substance of the testimony of Joe Atkins, for the State, in rebuttal, was that before the horses were recovered by Sharp Lee Estes told witness that he bought the gray stallion from a man in Milam county.

Sharp, recalled by the State, testified, in rebuttal, that after the man Gool was shot, and before he died, a negro man called

39 — TEX. APP. XXIII.

Gool by the name of "Jack Dupree." Gool raised himself on his elbow, looked around and lay down again without speaking. Witness thought, but did not know, that Gool was then conscious.

The State closed.

The defense proved by Coley Estes, in rebuttal, that in March, 1886, after the Scott horses were traded for by defendant, but before they were taken away by Sharp, he heard the defendant asking for a pair of wristlets, a pair of spurs and a silk handkerchief which he said he had either lost or that they had been stolen.

Jack Hilliard testified, for the defense, in rebuttal, that he was present at Harper's in February, 1886, and saw Lee Estes buy a gray stallion from a man who called himself George Gool. Lee Estes, in witness's presence, paid Gool seventy dollars for that horse.

The motion for new trial raised the questions discussed in the opinion.

*J. N. Wharton, Holland, Miles & Touchstone,* and *Alexander, Winter & Dickenson,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. The court erred in permitting the witness, L. Sharp, to testify, over objection of defendant, as follows: Witness was asked by the prosecuting attorney if the man who was wounded but not instantly killed, in San Augustine county, ever spoke afterwards. Witness replied he did not. Witness was then asked if anything transpired by which witness could tell whether the wounded man was conscious, and, if so, to state what it was. Witness answered yes; that on Monday morning after the shooting on the night before, a negro who lived in the community came up and said he knew that man, and pointed to the man Gool, and said his name was Dupree. Witness told the negro to call him by his name and see what he would do or say; that the negro called two or three times and then called him Jack Dupree, at which call the man raised up and looked around, but said nothing, and lay down and died in a short time. This was hearsay testimony, and did not come within any exception to the general rule which excludes that character of evidence. (Fuller v. The State, 19 Texas Ct. App., 380; Anderson v. The

State, 14 Id., 49; Jackson v. The State, 20 Id., 190; Harris v. The State, 1 Id., 74.) If Gool had stated to the witness Sharp that his name was Dupree, such statement would have been hearsay and inadmissible against defendant. This illegal evidence was material, and was calculated to prejudice the defendant, as it tended to identify the man Gool, killed in San Augustine county, the supposed man who stole the horses in Angelina county, as John L. Dupree, a person well known to defendant, it being a material issue in the case as to whether or not the man called Gool, from whom defendant purchased the horses, and who was afterwards killed in San Augustine county, was John L. Dupree.

II. It was error to permit the witness Atkins to testify about a conversation he had with Lee Estes concerning a horse which said Lee Estes had purchased. This testimony was hearsay—was after the offense, if any, had been committed and consummated in pursuance of a conspiracy between defendant and Lee Estes, even if such conspiracy had existed, and was not admissible under any rule of evidence known to us. (Chumley v. The State, 20 Texas Ct. App., 547; Ricks v. The State, 19 Id., 308.)

III. We will pass over some other errors assigned, which are not deemed material or likely to occur on another trial, and determine the last error insisted upon by the defendant, which is that the court erred in refusing the defendant a new trial, because the evidence does not support the conviction. In our opinion, this error is well assigned. Every inculpatory circumstance of any cogency is explained and accounted for by the evidence in the case. Defendant's explanation of his acquisition and possession of the horse was a reasonable one, and was not disproved but strongly corroborated by the other evidence in the case. There is no satisfactory evidence, direct or circumstantial, that at the time he purchased the horses he had any knowledge, or even suspicion, that they were stolen property. That he did purchase the horses, paying therefor almost if not quite their fair value, the evidence abundantly establishes. That the man called Gool, from whom he purchased said horses, was a stranger in that section, and was not John L. Dupree, was testified to most positively by several unimpeached witnesses. There is nothing in the conduct of the defendant with respect to the horses that indicates a knowledge on his part that they were stolen or that he received them fraudulently. In the whole evidence, which we have scrutinized closely, we are unable to find a single fact unexplained, which points with certainty to the defendant's

guilt of the offense of which he stands convicted. We think the trial judge should not have hesitated to set aside the verdict of the jury.

Because of the errors we have mentioned, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*